UNITED STATES of America, Plaintiff,

v.

James L. DICKERSON, et al.,
Defendants.

James L. DICKERSON, et al.,
Plaintiffs,

v.

ADMINISTRATOR, ENVIRONMENTAL
PROTECTION AGENCY, Defendant.

Civ. A. Nos. 84–80–VAL (WDO),
84–76–VAL (WDO).

United States District Court,
M.D. Georgia,
Valdosta Division.

May 4, 1987.

Jack Hood, Macon, Ga., for U.S.

Berrien L. Sutton, Homerville, Ga., for Dickerson et al.

## MEMORANDUM OPINION AND ORDER

OWENS, Chief Judge:

These actions, consolidated by order dated September 21, 1984, seek to clarify the rights and obligations of the various parties to the administrative order (the order) issued by the Environmental Protection Agency (EPA) on July 19, 1984. Pursuant to the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9601–75, this order required James L. Dickerson, Lareeta H. Dickerson, and Amtreco, Inc. (hereinafter the Dickersons) to initiate a cleanup of its abandoned wood treatment facility located in Homerville, Georgia. The Dickersons were given until July 24, 1984, to

begin the cleanup of the Homerville site, and were instructed that the cleanup should be completed no later than forty-two days thereafter. The Dickersons responded to this request by submitting for the EPA's approval its own proposed plan for cleaning up the site. The EPA extended the July 24, 1984, deadline in order to consider this proposal by the Dickersons. Following the submittal of their plan on August 27, 1984, the EPA, after considering its contents, rejected it on the basis that it did not propose an adequate solution to the problems at the Homerville site. The EPA subsequently informed the Dickersons that beginning September 5, 1984, it would begin a cleanup of the site utilizing funds from the Hazardous Substance Response Trust Fund.

In response to these actions, the Dickersons, on September 4, 1984, filed a complaint in this court seeking declaratory and injunctive relief from the proposed cleanup of the EPA. A temporary restraining order was granted to the Dickersons, thus maintaining the status quo pending resolution of the matter by the court. On September 21, 1984, the EPA filed its own complaint for declaratory and injunctive relief seeking, primarily, court permission for its immediate access to the Homerville site so that it could begin the cleanup process. Following the granting of the temporary restraining order, the parties informally agreed to attempt a settlement of this matter without the court's intervention. This settlement process has apparently reached an impasse, and, therefore, the court must now resolve the controversy.

### The EPA's Motion to Dismiss

The EPA has filed a motion to dismiss the Dickersons' complaint for failure to demonstrate subject matter jurisdiction over the claims. It is the EPA's contention that CERCLA precludes pre-enforcement review of its "response" actions unless those actions constitute either a cost recovery action under 42 U.S.C. § 9607 or a civil abatement suit under 42 U.S.C. § 9606. The reasons for this lack of pre-enforcement review is asserted to be that the nature of the EPA's work, protecting the public and the environment from the dangers of hazardous waste, requires it to have the ability to respond immediately, which under normal circumstances is long before legal determinations of liability have been made. The EPA admits, however, that its response actions are not completely unreviewable, but it contends that review is limited solely to the issue of whether a site poses a threat to either the public or the environment warranting a response action in the first instance. On this issue, the EPA urges that a determination by the EPA that a site is dangerous is subject to an arbitrary and capricious, abuse of discretion, or not otherwise in accordance with law standard of review. See 42 U.S.C. § 9604(e)(5)(B). In this case, the EPA maintains that the Homerville site clearly is a hazard that needs to be cleaned up, and its decision to do so was not clearly arbitrary and capricious. The Dickersons, on the other hand, contend that the site is not an imminent threat to the public health and welfare or the environment, nor has there been a "release" or threat of release at the Homerville site. They further contend that the cleanup proposal that they submitted is consistent with the national contingency plan and should, thus, be accepted by the EPA. The evidence presented to the court concerning the Homerville site shows the following.

### Factual Background

The land in question is located in Homerville, Georgia. Prior to ceasing operation sometime during 1980, the 5.6 acre site was used in a wood product preserving business. The primary chemical used in this business was creosote. Creosote has been classified as a hazardous substance, pursuant to 42 U.S.C. § 9601 (14), and is a recognized human and animal carcinogen. In January, 1984, representatives of the State of Georgia entered the site and collected test samples. The EPA was informed of the site by the Environmental Protection Division of the Georgia Department of Natural Resources in May of 1984. Shortly thereafter, on May 16, 1984, the EPA conducted its own inspection and preliminary

assessment of the site. That inspection, along with subsequent investigations, revealed the presence of two hundred and fifty-two drums in various conditions containing cresote constituents and hazardous solvents such as methyl ethyl ketone and benzene. Also present at the site are a pressure cylinder, two 20,000 gallon tanks and one 10,000 gallon tank, all of which contain, in various amounts, waste creosote. The site also contains two large, unlined surface impoundments, that contain large quantities of waste creosote.

Ten residences which use shallow wells to obtain drinking water from a nearby aquifer are located within one quarter mile of the site. The nearest well to the site being used for drinking purposes has been replaced with a deep well. There is no evidence, as of yet, that waste creosote has contaminated any of these wells, nor is there any evidence that this creosote has permeated into the water supply generally. Throughout the Homerville site, soil and vegetation stained by creosote are readily visible. The site is not secured from the public, and there are no containment walls that might prevent the spread of creosote during a heavy rainstorm. Based upon these relatively undisputed facts, the EPA seeks to enter the site and begin a cleanup that would include removing the hazardous waste to an authorized hazardous waste disposal area. The Dickersons contend that this sort of cleanup is much too expensive and seek to implement their own cleanup using an allegedly cheaper process known as biodegradation. Because of the government's motion to dismiss, the court must now determine what rights each of the parties maintain in this case that might block the actions of the other at this juncture.

### Conclusions of Law

Initially, the court must determine what rights, if any, the EPA has that would allow it to enter the Homerville site. On this point, CERCLA provides in relevant part,

(1) Whenever (A) any hazardous substance is released or there is a substantial threat of release into the environ-

ment, or (B) there is a release or substantial threat of release into the environment of any pollutant or contaminant which may present an imminent and substantial danger to the public health or welfare, the President is authorized to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance, pollutant, or contaminant at any time (including its removal from any contaminated natural resource), or take any other response measure consistent with the national contingency plan which the President deems necessary to protect the public health or welfare or the environment. When the President determines that such action will be done properly and promptly by the owner or operator of the facility or vessel or by any other responsible party, the President may allow such person to carry out the action, conduct the remedial investigation, or conduct the feasibility study in accordance with section 9622 of this title.

*See* 42 U.S.C. § 9604. As to what constitutes a "release" that would justify the EPA's entry on to the Homerville site, CERCLA provides,

(22) The term "release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant), but excludes (A) any release which results in exposure to persons solely within a workplace, with respect to a claim which such persons may assert against the employer of such persons, (B) emissions from the engine exhaust of a motor vehicle, rolling stock, aircraft, vessel, or pipeline pumping station engine. . . .

*See* 42 U.S.C. § 9601 (22). Finally, once the EPA has determined that a cleanup is required under CERCLA, the scope of its authority to enter the site is provided for in the definition of "removal" which states,

(23) The term "remove" or "removal" means the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief Act of 1974.

CERCLA further provides that should the EPA commence a civil action to compel compliance with a request or order, in the case of interference with entry or inspection, "the court shall enjoin such interference or direct compliance with orders to prohibit interference with entry or inspection unless under the circumstances of the case the demand for entry or inspection is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 42 U.S.C. § 9604(e)(5)(B).

■ In order to establish its right to conduct a response action, therefore, the EPA must establish that it has a reasonable basis to believe that there has been or may be a release of a hazardous substance into the environment, or that there has been or there is a substantial threat of release into the environment of a pollutant or contaminant which may present an imminent and substantial danger to the public health or welfare. It must further demonstrate that this conclusion is not arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. While this court is not completely convinced that the site in question is an *imminent* and substantial danger to the public health or welfare, it appears that Congress has already determined that substances classified as being hazardous, pursuant to 42 U.S.C. § 9601 (14), meet that criterion as a matter of law, and, thus, since the EPA contends that hazardous substances have been and continue to be released at the Homerville site, the EPA need only demonstrate that there has been a release or may be a release of a hazardous substance. It is undisputed that creosote is a known carcinogen and has been classified by Congress as being hazardous. This fact, combined with the general condition of the site as previously described, leaves this court with the inescapable duty of concluding that the EPA is authorized to conduct a response action at the site. In fact, the Dickersons do not really contend that the site does not need to be cleaned up. Their primary contention is that the cost of the proposed EPA solution is exorbitant compared to their more cost-effective solution to the problem. The court, therefore, concludes that the EPA's decision to cleanup the Homerville site is not clearly arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

■ The more difficult question to be decided by the court is whether the Dickersons, as potentially responsible persons, can seek a declaration of non-liability prior to any cost-recovery action by the EPA. In order to decide this issue, the court must first determine whether the Declaratory Judgment Acts' language of "actual controversy" has been met. In discussing the term "actual controversy," the Supreme Court has stated,

The difference between an abstract question and a "controversy" contemplated by the Declaratory Judgment Act is necessarily one of degree.... Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is substantial controversy, between parties having adverse legal interests of sufficient immediacy and reality to warrant issuance of a declaratory judgment.

The actual enforcement of a statute or regulation, or the commencement of a suit by a private party is no prerequisite of a suit to establish non-liability. *See Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1974); and *Lake Carriers Association v. MacMullan,* 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972). A party seeking such relief, however, must demonstrate that his fear of government action is sufficiently real and immediate, and that these fears are based upon the actions or representations of one's potential adversary.

■ Here, the Dickersons, as owners of the Homerville site, are understandably concerned about the possibility of being held liable under 42 U.S.C. § 9607. These fears are, thus, not "imaginary or speculative," especially in light of the EPA's letters informing them that the EPA would conduct the cleanup using superfund monies and that they "may be liable" for the sums thus expended on the cleanup. *See Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974). Because of the factual nature of any future cost-recovery action, however, this court is constrained to find that the issue of the Dickersons' non-liability for these proposed cleanup expenditures is not presently "ripe" for adjudication.

■ At the present time, neither side has been able to stipulate to a dollar amount that will guarantee a full and complete cleanup of the Homerville site. Nor can either side state categorically that what they have proposed will bring to an immediate conclusion the problems of hazardous waste at the site. Based upon these facts, it is impossible for the court to determine presently what expenditures would be justified by the national contingency plan prior to the actual cleanup itself since neither side really can predict what they will find until they begin the cleanup. Because the relief the Dickersons seek depends to a great extent on factual issues not developed at the present, the court concludes that there is not an "actual controversy" ready for decision. *See Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission,* 461 U.S. 190, 201, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983) (controversy found "ripe" where the issue presented was predominantly legal in nature).

■ The court further notes that even if the Dickersons' complaint was sufficiently "ripe" for purposes of the Declaratory Judgment Act's "actual controversy" requirement, the provisions of the Administrative Procedure Act (APA) would bar review of the EPA's present actions. The APA provides,

[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

Since the EPA wants to conduct the cleanup itself, rather than seek enforcement of the administrative order issued on July 19, 1984, the "final agency action" the Dickersons complain of is the decision of the EPA to cleanup the site in the manner proposed by it. The EPA's decision to take response action pursuant to 42 U.S.C. § 9604(a) is not explicitly made reviewable by statute, nor is the court convinced that judicial review should be inferred from the provisions of CERCLA. In fact, CERCLA, by explicitly providing for judicial review of the EPA's actions in other sections of the Act, *i.e.,* 42 U.S.C. § 9606 and § 9607, and by not similarly providing for judicial review under 42 U.S.C. § 9604(a), creates the negative inference that judicial review of an EPA response action under this section was not intended by Congress. *See J.V.*

*Peters & Co., Inc. v. Administrator, EPA,* 767 F.2d 263, 264 (6th Cir.1985).

This conclusion is buttressed by a number of factors. The primary purpose of CERCLA is the prompt cleanup of hazardous waste sites. *See Walls v. Waste Resource Corp.,* 761 F.2d 311, 318 (6th Cir. 1985). It is not hard to envision how a litigious owner of a hazardous waste site could frustrate the function of the Act if this court were to rule that pre-response review of a proposed EPA section 9604 cleanup action were available as a matter of right. *See J.V. Peters & Co., Inc.,* 767 F.2d at 264; *Lone Pine Steering Committee v. EPA,* 600 F.Supp. 1487, 1495 (D.N.J.), *aff'd,* 777 F.2d 882 (3rd Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986); and *Aminoil, Inc. v. EPA,* 599 F.Supp. 69, 71 (C.D.Cal.1984).

■ Furthermore, where the EPA itself seeks to conduct the cleanup, the same considerations that might warrant pre-response review prior to an owner being required to cleanup a site are not present. For example, if the EPA seeks to enforce, pursuant to 42 U.S.C. § 9606(a), its own administrative order, the owner would be immediately liable for the costs of the EPA mandated cleanup. The owner's right to claim that the proposed EPA plan of cleanup deviates from the national contingency plan, and, accordingly, he should not be held liable for the costs of that cleanup, would be defeated as a practical matter if pre-response review were not allowed since the chances of recovering from the government the amounts not authorized by the national contingency plan would be slim at best. *See Wagner Electric Corp. v. Thomas,* 612 F.Supp. 736, 739 (D.Kan.1985) (citing *Aminoil, Inc.,* 599 F.Supp. at 73–74); and *United States v. Reilly Tar & Chemical Corp.,* 606 F.Supp. 412, 416 (D. Minn. 1985). If the EPA conducts the cleanup itself utilizing superfund monies, however, pre-response review is not necessary. In this latter situation, an owner can adequately assert in the subsequent cost- recovery action his right not to pay any expenses incurred as a result of the EPA's deviation from the national contingency plan. *See J.V. Peters & Co., Inc.,* 767 F.2d at 265–66 and cases cited therein. The national contingency plan is designed to meet the Dickersons' concerns raised in their complaint by requiring the response action taken to be cost-effective. *See* 42 U.S.C. § 9605(7). Furthermore, CERCLA precludes response actions by the EPA if a responsible party will take proper removal and remedial action. *See* 42 U.S.C. § 9604(a)(1)(A); and 40 C.F.R. § 300.61(b). While in this case the EPA asserts that the proposed Dickerson response is not a "proper" removal and remedial action, should a court conclude that it was a proper response, the EPA potentially could only recover the cost that the Dickersons would have otherwise incurred in implementing their plan. Since CERCLA does not provide an absolute right for the EPA to recover its costs of cleanup, the Dickersons cannot suffer any harm for refusing to implement a cleanup policy it believes in good faith not to be consistent with the national contingency plan.

Because the Dickersons cannot be held liable as a matter of law for any expenses not authorized by the national contingency plan, their only right to complain about the EPA's use of superfund monies in an improper way would stem from their injury as taxpayers. As such, the Dickersons merely allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute. The Dickersons, therefore, do not have standing to object to the EPA's expenditure of these funds. *See Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

Accordingly, the court finds that the EPA's designation of the Homerville site as being one containing hazardous waste necessitating cleanup is not arbitrary and capricious, an abuse of discretion, or not otherwise in accordance with the law. The court further finds that the Dickersons may not enjoin the EPA from entering the site and removing the hazardous waste materials. The court declares, however, that the EPA is absolutely barred from recovering, in any future cost-recovery action against the Dickersons, any expenditure that was not consistent with the national

contingency plan. The EPA is hereby authorized, in accordance with the accompanying order, to enter the property of the Dickersons and to effectuate a cleanup of the Homerville site. The Dickersons' complaint seeking declaratory and injunctive relief is, thereby, DISMISSED.